RECEIPT # _____
AMOUNT $ 150 _____ *PK*
SUMMONS ISSUED yes _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. Kim Aba_____
DATE 2-1-04

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAWRENCE S. WICK, as custodian for Ryan S. Wick, Andrew T. Wick, and Hayley L. Wick, and Ryan S. Wick, Andrew T. Wick, and Hayley L. Wick individually and on behalf of others similarly situated, ) ) ) ) ) ) ) | **CIVIL ACTION NO.** |
| Plaintiffs, ) ) ) | **CLASS ACTION COMPLAINT** |
| v. ) ) ) | |
| FLEETBOSTON FINANCIAL CORPORATION; COLUMBIA MANAGEMENT GROUP, INC.; COLUMBIA MANAGEMENT ADVISORS, INC.; COLUMBIA WANGER ASSET MANAGEMENT, L.P.; COLUMBIA FUNDS DISTRIBUTOR, INC.; COLUMBIA ACORN FUND, COLUMBIA ACORN SELECT, COLUMBIA ACORN USA, COLUMBIA ASSET ALLOCATION FUND, COLUMBIA BALANCED FUND, COLUMBIA COMMON STOCK FUND, COLUMBIA DISCIPLINED VALUE FUND, COLUMBIA DIVIDEND INCOME FUND, COLUMBIA GROWTH & INCOME FUND, COLUMBIA GROWTH FUND, COLUMBIA GROWTH STOCK FUND, COLUMBIA LARGE CAP CORE FUND, COLUMBIA LARGE CAP GROWTH FUND, COLUMBIA LARGE COMPANY INDEX FUND, COLUMBIA LIBERTY FUND, COLUMBIA MID CAP GROWTH FUND, COLUMBIA MID CAP VALUE FUND, COLUMBIA REAL ESTATE EQUITY FUND, COLUMBIA SMALL CAP FUND, COLUMBIA SMALL CAP VALUE FUND, COLUMBIA SMALL COMPANY EQUITY FUND, COLUMBIA SMALL COMPANY INDEX FUND, COLUMBIA STRATEGIC INVESTOR FUND, COLUMBIA TAX-MANAGED AGGRESSIVE GROWTH FUND, COLUMBIA TAX-MANAGED GROWTH FUND, COLUMBIA TAX-MANAGED GROWTH FUND II, COLUMBIA TAX- ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED**  04-10408 MEU  MAGISTRATE JUDGE Alexander |

**Caption continued on next page**

MANAGED VALUE FUND, COLUMBIA )
TECHNOLOGY FUND, COLUMBIA )
THERMOSTAT FUND, COLUMBIA UTILITIES )
FUND, COLUMBIA YOUNG INVESTOR )
FUND, COLUMBIA ACORN INTERNATIONAL,)
COLUMBIA ACORN INTERNATIONAL )
SELECT, COLUMBIA EUROPE FUND, )
COLUMBIA GLOBAL EQUITY FUND, )
COLUMBIA INTERNATIONAL EQUITY FUND,)
COLUMBIA INTERNATIONAL STOCK FUND, )
COLUMBIA NEWPORT ASIA PACIFIC FUND, )
COLUMBIA NEWPORT JAPAN )
OPPORTUNITIES FUND, COLUMBIA )
NEWPORT GREATER CHINA FUND, )
COLUMBIA NEWPORT TIGER FUND, )
COLUMBIA CONTRARIAN INCOME FUND, )
COLUMBIA CORPORATE BOND FUND, )
COLUMBIA FEDERAL SECURITIES FUND, )
COLUMBIA FIXED INCOME SECURITIES )
FUND, COLUMBIA FLOATING RATE )
ADVANTAGE FUND, COLUMBIA FLOATING )
RATE FUND, COLUMBIA HIGH YIELD FUND, )
COLUMBIA HIGH YIELD OPPORTUNITY )
FUND, COLUMBIA INCOME FUND, )
COLUMBIA INTERMEDIATE BOND FUND, )
COLUMBIA INTERMEDIATE GOVERNMENT )
INCOME FUND, COLUMBIA MONEY )
MARKET FUND, COLUMBIA QUALITY PLUS )
BOND FUND, COLUMBIA SHORT TERM )
BOND FUND, COLUMBIA STRATEGIC )
INCOME FUND, COLUMBIA US TREASURY )
INDEX FUND, COLUMBIA CALIFORNIA TAX )
-EXEMPT FUND, COLUMBIA CONNECTICUT )
INTERMEDIATE MUNICIPAL BOND, )
COLUMBIA CONNECTICUT TAX-EXEMPT )
FUND, COLUMBIA FLORIDA )
INTERMEDIATE MUNICIPAL BOND FUND, )
COLUMBIA HIGH YIELD MUNICIPAL FUND, )
COLUMBIA INTERMEDIATE TAX-EXEMPT )
BOND FUND, COLUMBIA MANAGED )
MUNICIPALS FUND, COLUMBIA )
MASSACHUSETTS INTERMEDIATE )
MUNICIPAL BOND FUND, COLUMBIA )
MASSACHUSETTS TAX-EXEMPT FUND, )
COLUMBIA MUNICIPAL MONEY MARKET )

**Caption continued on next page**

FUND, COLUMBIA NATIONAL MUNICIPAL     )
BOND FUND, COLUMBIA NEW JERSEY     )
INTERMEDIATE MUNICIPAL BOND FUND,     )
COLUMBIA NEW YORK INTERMEDIATE     )
MUNICIPAL BOND FUND, COLUMBIA     )
NEW YORK TAX-EXEMPT FUND, COLUMBIA)
OREGON MUNICIPAL BOND FUND,     )
COLUMBIA PENNSYLVANIA     )
INTERMEDIATE MUNICIPAL BOND FUND,     )
COLUMBIA RHODE ISLAND INTERMEDIATE )
MUNICIPAL BOND FUND, COLUMBIA TAX-  )
EXEMPT FUND, COLUMBIA TAX-EXEMPT     )
INSURED FUND, COLUMBIA SMALL CAP     )
GROWTH FUND, COLUMBIA EUROPEAN     )
THEMATIC EQUITY FUND, COLUMBIA     )
GLOBAL THEMATIC EQUITY FUND,     )
COLUMBIA DAILY INCOME COMPANY     )
FUND (collectively known as "COLUMBIA     )
FUNDS"); COLUMBIA ACORN TRUST,     )
COLUMBIA BALANCED FUND INC./OR,     )
COLUMBIA COMMON STOCK FUND INC.,     )
COLUMBIA DAILY INCOME COMPANY,     )
COLUMBIA FIXED INCOME SECURITIES     )
FUND INC., COLUMBIA FLOATING RATE     )
ADVANTAGE FUND, COLUMBIA FLOATING )
RATE FUND, COLUMBIA FUNDS TRUST I,     )
COLUMBIA FUNDS TRUST II, COLUMBIA     )
FUNDS TRUST III, COLUMBIA FUNDS     )
TRUST IV, COLUMBIA FUNDS TRUST IX,     )
COLUMBIA FUNDS TRUST V, COLUMBIA     )
FUNDS TRUST VI, COLUMBIA FUNDS     )
TRUST VII, COLUMBIA FUNDS TRUST VIII,     )
COLUMBIA FUNDS TRUST XI, COLUMBIA     )
GROWTH FUND INC., COLUMBIA HIGH     )
YEILD FUND INC., COLUMBIA     )
INSTITUTIONAL FLOATING RATE INCOME     )
FUND, COLUMBIA INTERNATIONAL STOCK  )
FUND INC., COLUMBIA MID CAP GROWTH     )
FUND INC., COLUMBIA OREGON     )
MUNICIPAL BOND FUND INC., COLUMBIA     )
NATIONAL MUNICIPAL BOND FUND INC.,     )
COLUMBIA REAL ESTATE EQUITY FUND     )
INC., COLUMBIA SHORT TERM BOND FUND  )
INC., COLUMBIA SMALL CAP GROWTH     )
FUND INC., COLUMBIA STRATEGIC     )
**Caption continued on next page**

3

```
INVESTOR FUND INC.,                            )
COLUMBIA TECHNOLOGY FUND INC.                   )
(collectively known as "COLUMBIA FUNDS         )
REGISTRANTS")                                   )
                                                )
                        Defendants.             )
_____ )
```

Plaintiffs Lawrence S. Wick, Ryan S. Wick, Andrew T. Wick, and Hayley L. Wick,

("Plaintiffs"), by their attorneys, allege upon personal knowledge as to themselves and their acts and as to all

other matters upon information and belief the following:

## **NATURE OF THE ACTION**

1.      This is a federal class action on behalf of a class consisting of all persons other than

Defendants or its directors, officers, employees or their families, or any entity affiliated with

Defendants, who purchased or otherwise acquired shares or other ownership units of one or more

of the mutual funds in the Columbia family of funds (i.e., the Columbia Funds as defined in the

caption, above) between January 1, 1996 and January 14, 2004, inclusive, and who were damaged

thereby. Plaintiffs seek to pursue remedies under the Securities Act of 1933 (the "Securities Act"),

the Securities Exchange Act of 1934 (the "Exchange Act") and the Investment Advisers Act of

1940 (the "Investment Advisers Act") (the "Class").

2.      This action charges Defendants with engaging in an unlawful and deceitful course

of conduct designed to financially advantage Defendants improperly to the detriment of Plaintiffs

and the other members of the Class. As part of Defendants' unlawful conduct, the Fund

Defendants, as defined below, in clear contravention of their fiduciary responsibilities, and

disclosure obligations, failed to disclose properly that select favored customers were allowed to

"time" their mutual fund trades. Such timing, as more fully described below, improperly allows an

investor to trade in and out of a mutual fund to exploit short-term moves and inefficiencies in the

manner in which the mutual funds price their shares.

3. The truth emerged on January 15, 2004. On that date, before the market opened, FleetBoston Financial Corporation announced in a press release over Business Wire that its subsidiaries, Columbia Management Advisors, Inc. ("Columbia Management") and Columbia Funds Distributor, Inc. ("Columbia Distributor") received "Wells" notices from the regional office of the Securities and Exchange Commission ("SEC") in Boston, Massachusetts stating that the regional office intended on recommending an enforcement action against Columbia Management and Columbia Distributor for failing to disclose market timing activity in the Columbia family of mutual funds.

4. In a letter to shareholders dated January 30, 2004, and later posted on Columbia Management's website, Columbia Management and Columbia Distributor acknowledged that the SEC and the New York Attorney General have been investigating the mutual fund trading activities in the Columbia Funds, defined below. Further, Columbia Management and Columbia Distributor stated that certain privileged investors were permitted to market time the Columbia Newport Tiger Fund, Columbia Growth Stock Fund, and the Columbia Young Investor Fund, which targeted children, from as early as 1998 to 2003. In addition, Columbia Management and Columbia Distributor stated that they had determined that the portfolio manager of the Columbia Small Company Equity Fund engaged in market timing through his 401(K) account in various Columbia Funds.

5. On February 13, 2004, The Wall Street Journal reported that FleetBoston acknowledged that it had allowed improper market timing in the Columbia Young Investor Fund, Columbia Newport Tiger Fund, and Columbia Growth Stock Fund and that the Columbia Funds, accepted "sticky assets" from certain privileged investors in exchange for timing capacity in the

5

Columbia Funds.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to § 27 of

the Exchange Act of 1934 (15 U.S.C. § 78aa); Section 22 of the Securities Act (15 U.S.C. § 77v);

Section 80b-14 of the Investment Advisers Act (15 U.S.C. § 80b-14); and 28 U.S.C. §§ 1331,

1337.

7.      Many of the acts charged herein, including the preparation and dissemination of

materially false and misleading information, occurred in substantial part in this District.

Defendants conducted other substantial business within this District and many Class members

reside within this District.

8.      In connection with the acts alleged in this Complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications and the facilities of the national securities

markets.

## PARTIES

**A.      Plaintiffs**

9.      Plaintiff, Lawrence S. Wick, as custodian for Ryan S. Wick, Andrew T. Wick, and

Hayley L. Wick,  individually and as set forth in his certification, which is attached hereto and

incorporated by reference herein, purchased shares or units of the "Columbia Young Investor

Fund" (a/k/a "Liberty Young Investor Fund") during the Class Period and has been damaged

thereby.

10.     Plaintiff, Ryan S. Wick, owned or owns units of the "Columbia Young Investor

Fund" (a/k/a "Liberty Young Investor Fund") during the Class Period and has been damaged

thereby.

11.     Plaintiff, Andrew T. Wick, owned or owns units of the "Columbia Young Investor Fund" (a/k/a "Liberty Young Investor Fund") during the Class Period and has been damaged thereby.

12.     Plaintiff, Hayley L. Wick, owned or owns units of the "Columbia Young Investor Fund" (a/k/a "Liberty Young Investor Fund") during the Class Period and has been damaged thereby.

**B.     Defendants**

13.     Each of the Columbia Funds, including the Columbia Young Investor Fund, is a mutual fund that is regulated by the Investment Company Act of 1940, managed by Defendant, Columbia Management and/or Columbia Wanger, as defined below, and that buy, hold, and sell shares or other ownership units that are subject to the misconduct alleged in this complaint.

14.     Defendant, FleetBoston Financial Corporation ("FleetBoston") is a financial services company and the parent of Defendants bearing the Columbia name. FleetBoston maintains its corporate headquarters at 100 Federal Street, Boston, Massachusetts 02110.

15.     Defendant, Columbia Management Group, Inc. ("Columbia Group"), wholly-owned subsidiary of FleetBoston, is the asset management arm of FleetBoston. Through its member firms, including Columbia Management and Columbia Wanger Asset Management, L.P. ("Columbia Wanger"), Columbia Group offers asset management services and financial products. Columbia Group is located at One Financial Center, Boston, MA 02111-2621.

16.     Defendant, Columbia Management, a wholly-owned subsidiary of Columbia Group, offers investment products and money management services. Columbia Management is registered as an investment advisor under the Investment Advisers Act and, together with Columbia Wanger,

7

managed and advised the Columbia Funds during the Class Period. Columbia Management, along with Columbia Wanger, has ultimate responsibility for overseeing the day-to-day management of the Columbia Funds. Columbia Management is headquartered at 100 Federal Street, Boston, Massachusetts 02110.

17.    Defendant, Columbia Wanger, a wholly-owned subsidiary of Columbia Group, offers investment products and money management services. Columbia Management is registered as an investment advisor under the Investment Advisers Act and, together with Columbia Management, managed and advised the Columbia Funds during the Class Period. Columbia Wanger, along with Columbia Management, has ultimate responsibility for overseeing the day-to-day management of the Columbia Funds. Columbia Wanger is headquartered at 227 West Monroe, Suite 3000, Chicago, Illinois 60606.

18.    Columbia Distributor, a subsidiary of FleetBoston, was the distributor of the Columbia Funds during the Class Period. Columbia Distributor maintains is headquarters at One Financial Center, Boston, Massachusetts 02111.

19.    Defendants, Columbia Funds Registrants are the registrants and issuers of the shares of one or more of the Columbia Funds.

20.    FleetBoston, Columbia Group, Columbia Management, Columbia Wanger, Columbia Distributor, Columbia Funds Registrants and the Columbia Funds are referred to collectively herein as the "Fund Defendants."

### CLASS ALLEGATIONS

21.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities, except the directors, officers, or employees of Defendants and any entity affiliated with any of the

Defendants, who purchased or otherwise acquired shares or like interests in any of the Columbia Funds, between February 13, 1999 and January 14, 2004, inclusive, and who were damaged thereby. Plaintiffs and each of the Class members purchased shares or other ownership units in Columbia Funds pursuant to a registration statement and prospectus. The registration statements and prospectuses pursuant to which Plaintiffs and the other Class members purchased their shares or other ownership units in the Columbia Funds are referred to collectively herein as the "Prospectuses." Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

22.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Columbia Funds and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

23.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

24.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

25.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial statements of the Columbia Funds; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

26.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Introduction: The Double Standard for Privileged Investors

27.    Mutual funds, including the Columbia Funds, are meant to be long-term investments and are therefore the favored savings vehicles for many Americans' retirement and college funds. However, unbeknown to investors, from at least as early as February 13, 1999 to January 14, 2004, inclusive, Defendants engaged in fraudulent and wrongful schemes that enabled certain favored investors to reap many millions of dollars in profit, at the expense of Plaintiffs and other members of the Class, through secret timed trading. In exchange for allowing and facilitating this improper conduct, the Fund Defendants received substantial fees and other remuneration for

themselves and their affiliates to the detriment of Plaintiffs and other members of the Class who

knew nothing of these illicit arrangements. Specifically, the Advisors, as managers of the

Columbia Funds, and each of the relevant fund managers, profited from fees the Advisors charged

to the Columbia Funds that were measured as a percentage of the fees under management. In

exchange for the right to engage in timing, which hurt Plaintiffs and other Class members,

materially and negatively affecting the value of the Columbia Funds, Defendants agreed to park

substantial assets in the Funds, thereby increasing the assets under Columbia Funds' management

and the fees paid to Columbia Funds' managers. The assets parked in the Columbia Funds in

exchange for the right to engage in timing have been referred to as "sticky assets." The synergy

between the Defendants hinged on ordinary investors' misplaced trust in the integrity of mutual

fund companies and allowed Defendants to profit handsomely at the expense of Plaintiffs and other

members of the Class.

### Secret Timed Trading at the Expense of Plaintiffs and Other Members of the Class

28.    "Timing" is an arbitrage strategy involving short-term trading that can be used to

profit from mutual funds use of "stale" prices to calculate the value of securities held in the funds'

portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such

securities as of the time the net asset value ("NAV") is calculated. A typical example is a U.S.

mutual fund that holds Japanese securities. Because of the time zone difference, the Japanese

market may close at 2 a.m. New York time. If the U.S. mutual fund manager uses the closing

prices of the Japanese securities in his or her fund to arrive at an NAV at 4 p.m. in New York, he

or she is relying on market information that is fourteen hours old. If there has been positive market

moves during the New York trading day that will cause the Japanese market to rise when it later

opens, the stale Japanese prices will not reflect them, and the fund's NAV will be artificially low.

Put another way, the NAV would not reflect the true current market value of the stocks the fund holds. This and similar strategies are known as "time zone arbitrage."

29.    A similar type of timing is possible in mutual funds that contain illiquid securities such as high-yield bonds or small capitalization stocks. Here, the fact that some of the Columbia Funds' underlying securities may not have traded for hours before the New York closing time can render the fund's NAV stale and thus open it to being timed. This is sometimes known as "liquidity arbitrage."

30.    Effective timing captures an arbitrage profit that comes dollar-for-dollar out of the pockets of the long-term investors: the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund. If the timer sells short on bad days, the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

31.    Besides the wealth transfer of arbitrage (called "dilution"), timers also harm their target funds in a number of other ways. They impose their transaction costs on the long-term investors. Trades necessitated by timer redemptions can also result in the realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market.

32.    It is widely acknowledged that timing inures to the detriment of long-term mutual fund shareholders and, because of this detrimental effect, the Prospectuses stated that timing is monitored and that the Fund Defendants work to prevent it. These statements were materially false and misleading because the Fund Defendants allowed the market timers to time their trades and profit at the expense of ordinary fund investors.

## Defendants' Fraudulent Scheme

33.    On September 4, 2003 The Wall Street Journal reported that the New York Attorney

General Elliot Spitzer had filed a complaint in New York Supreme Court alleging that certain

mutual fund companies secretly allowed, and in some instances facilitated, a New Jersey-based

hedge fund to engage in prohibited and/or fraudulent trading in mutual fund shares (the "Spitzer

Complaint"). In return for this favored treatment, which damaged long-term mutual fund investors,

the hedge fund parked funds in financial instruments controlled by the fund companies or their

affiliates to increase fund management fees, and entered into other arrangements which benefited

the fund companies and/or their affiliates. The article reported as follows regarding the matter:

> Edward Stern ... finds himself at the center of a sweeping investigation into the
> mutual-fund industry after paying $40 million to settle charges of illegal trading
> made by the New York State Attorney General's Office. According to the
> settlement, Mr. Stern's hedge fund, called Canary Capital Partners LLC, allegedly
> obtained special trading opportunities with leading mutual-fund families--including
> Bank of America Corp's Nations Funds, Bank One Corp., Janus Capital Group Inc.
> and Strong Financial Corp.-- by promising to make substantial investments in
> various funds managed by these institutions. [Emphasis in original].

34.    The article indicated that the fraudulent practices enumerated in the Spitzer

Complaint were just the tip of the iceberg, stating as follows:

> In a statement, Mr. Spitzer said "the full extent of this complicated fraud is not yet
> known," but he asserted that "the mutual fund industry operates on a double
> standard" in which certain traders "have been given the opportunity to manipulate
> the system. They make illegal after-hours trades and improperly exploit market
> swings in ways that harm ordinary long-term investors."

(Emphasis added).

35.    The Spitzer Complaint received substantial press coverage and sparked additional

13

investigations by state agencies, the SEC and the U.S. Attorney for the Southern District of New

York, and led to calls for more regulation and tougher enforcement of the mutual and hedge fund

industries. On September 5, 2003, The Wall Street Journal reported that the New York Attorney

General's Office had subpoenaed "a large number of hedge funds" and mutual funds as part of

its investigation, "underscoring concern among investors that the improper trading of mutual fund

shares could be widespread" and that the SEC, joining the investigation, planned to send

letters to mutual funds holding about 75% of assets under management in the U.S. to inquire about

their practices with respect to market-timing and fund-trading practices.

36.    On January 15, 2004, before the market opened, FleetBoston issued a press release

reporting its fourth quarter 2003 results and further, revealing that Columbia Management and

Columbia Funds Distributor had received "Wells" notices from the SEC relating to improper

market timing in Columbia Funds and that the SEC intended to commence an enforcement action

against Columbia Management and Columbia Funds Distributor. In the release, FleetBoston stated,

in relevant part, as follows:

> In a separate development, FleetBoston said that earlier this month two of its
> subsidiaries, Columbia Management Advisors, Inc., and Columbia Funds
> Distributor, Inc., received "Wells" notices stating that the SEC Regional Office staff
> in Boston had made a preliminary determination to recommend that enforcement
> action be brought against them, alleging that certain fund prospectuses did not
> accurately disclose, in violation of fiduciary duties, certain trading activity in fund
> shares. We believe that the allegations relate to a limited number of trading
> arrangements occurring in the period 1998-2003. The majority of trades made
> pursuant to these arrangements were made by three entities and occurred in one
> international and two domestic funds. None of these arrangements is in existence
> today. The subsidiaries intend to engage in discussions with the SEC in an effort to
> reach a satisfactory resolution of these matters.

37.    On January 16, 2004, the Fund Defendants filed with the SEC a prospectus

supplement for various Columbia Funds which provided further detail on various investigations of

the Fund Defendants commenced by the SEC and the New York Attorney General. The prospectus

supplement stated, in relevant part, as follows:

> Legal Proceedings. Columbia Management Advisors, Inc. ("CMA"), the Funds' adviser, and Columbia Funds Distributor, Inc. ("CFDI") the distributor of the Funds I shares, and certain of their affiliates (collectively, "Columbia ") have received information requests and subpoenas from various regulatory authorities, including the Securities and Exchange Commission ("SEC") and the New York Attorney General, in connection with their investigations of late trading and market timing in mutual funds. Columbia has not uncovered any instances where CMA or CFDI were knowingly involved in late trading of mutual fund shares.
>
> **Columbia has identified a limited number of investors who had informal arrangements for trading Fund shares between 1998 and 2003. A majority of the transactions in connection with these arrangements occurred in one international fund and two domestic funds. The majority of the trading under these arrangements was made by three entities.** A substantial majority of the trading had ended by October 2002. None of these arrangements exists today. Information relating to those trading arrangements has been supplied to various regulatory authorities. To the extent that any Fund whose shares were involved in those trading activities was harmed by them, Columbia has undertaken to reimburse the Fund.
>
> The SEC staff has issued notices to the effect that it has made a preliminary determination to recommend that the SEC bring civil enforcement actions, including injunctive proceedings, against CMA and CFDI, alleging that they have violated certain provisions of the federal securities laws. Columbia believes that those allegations are based principally on the trading arrangements referred to above. CMA and CFDI are engaged in discussions with the SEC staff in an effort to reach a satisfactory resolution of these matters. However, there can be no assurance that such a resolution will be reached. Any potential resolution of these matters may include, but not be limited to, sanctions, financial penalties, damages or injunctions regarding CMA or CFDI, and structural changes in the conduct of their business. Although Columbia does not believe that these regulatory developments or their resolution will have a material adverse effect on the Funds, or on the ability of CMA and CFDI to provide services to the Funds, there can be no assurance that these matters or any adverse publicity or other developments resulting from them will not result in increased redemptions or reduced sales of Fund shares, which could increase transactions costs or operating expenses, or other consequences for the Funds. [Emphasis added.]

38.     In a letter to shareholders dated January 30, 2004, Joseph Palombo, Chief Operating

Officer of Columbia Management and James Tambone, Co-President of Columbia Distributor

acknowledged that the Fund Defendants were the subject of the investigation into mutual fund

trading activities by the SEC and the New York State Attorney General. Palombo and Tambone

stated, in relevant part, as follows:

**Columbia Management is:**

> Cooperating with Inquiries and Investigations As you may have read, during recent weeks and months, the Securities and Exchange Commission ("SEC"), the New York Attorney General and other authorities have been investigating mutual fund trading activities of firms across the US. Columbia Management is one of the firms included in these investigations. **Specifically, Columbia Management Advisors, Inc. ("CMA"), the advisor to the Columbia Family of Funds, and Columbia Funds Distributor, Inc. ("CFDI"), the distributor of the Columbia Family of Funds, and certain of their affiliates (collectively, "Columbia") have received and responded to information requests and subpoenas from various authorities**. Columbia Management has and will continue to cooperate fully with all requests for information and subpoenas.

> **Reviewing Historical Trading Activity**
> • Columbia Management does not knowingly permit late trading. Furthermore, we have not uncovered any instances where Columbia employees were knowingly involved in late trading of mutual fund shares.

> • Columbia Management has identified a limited number of investors who had informal arrangements for trading fund shares between 1998 and 2003. A majority of the transactions in connection with these arrangements occurred in one international fund, the Columbia Newport Tiger Fund, and two domestic funds, the Columbia Growth Stock Fund and the Columbia Young Investor Fund. The majority of the trading under these arrangements was made by three entities. <u>A substantial majority of the trading had ended by October 2002 and none of these arrangements exists today. If it is determined that the affected funds were harmed by these trading arrangements, CMA will reimburse them.</u>

> • Columbia Management holds all asset management professionals to a high ethical standard and monitors their trading activity on an ongoing basis. **Columbia Management has determined that one portfolio manager, who managed the Columbia Small Company Equity Fund, an approximately $400 million fund, made frequent trades through his 401(k) account in both the fund that he managed and other funds**. Although the underlying trades made by this portfolio manager were relatively small, his trading was not consistent with the ethical standards of Columbia Management. Columbia Management terminated the portfolio manager's employment upon discovery of his trading activity. Information about the portfolio manager's trading activity has been provided to the SEC and the New York Attorney General. If it is determined that the affected funds were harmed by the portfolio manager's trading activity, CMA will reimburse them. [Emphasis added.]

39.    On February 13, 2004, The Wall Street Journal reported that FleetBoston confirmed

that the Fund Defendants permitted and facilitated improper market timing in at least three

Columbia Funds, the Columbia Young Investor Fund, Columbia Newport Tiger Fund, and

the Columbia Growth Stock Fund, in violation of the explicit policies against such trading activity

contained in the Funds' prospectuses. The article reported, in relevant part, as follows:

> **Mutual-Fund employees at a unit of FleetBoston Financial Corp. improperly allowed "market-timers" to conduct rapid fire trades in three funds-including one targeted at children**--according to the company and people familiar with the trading.
>
> **Rapid trading in the $855 million Young Investor Fund could prove especially embarrassing for Fleet because the revelation means employees in its sales arm allowed the fast-moving investors to skim profits from kids.** The fund, founded by Fleet's Stein Roe unit and now called the Columbia Young Investors Fund, focuses on stocks that "meet the needs of young consumers" and has its own child-centered Web site, younginvestor.com, to teach kids the value of starting to invest at a young age.
>
> **Yesterday, Boston-based Fleet also acknowledged that its Columbia Funds unit and predecessor Liberty allowed trading in the $371 million Newport Tiger Fund and the $855 million Stein Roe Growth Stock Fund. Fleet also said that it would reimburse investors for losses caused by market-timing activity.**
>
> ****
>
> Asian stock funds, such as Newport Tiger, and other international funds are generally considered to be especially vulnerable to harm from market timers, who take advantage of time-zone differences and buy and sell fund shares at outdated prices. But the current scandal-related investigations into share trading have found few instances where fund officials allowed their foreign-stock funds to b used for market-timing because f the outsized opportunity to skim profits. As a result, the discovery of market-timing in the Newport Tiger fund is one the few instances where improper trading has been found in such a portfolio of overseas stocks.
>
> **At the same time, Columbia Funds accepted so-called sticky assets, according to people familiar with the matter. In sticky-asset deals, market-timers put money in other investment vehicles run by the firm in order to help gain access to certain mutual funds for market-timing.**
>
> ****
>
> Currently, many Columbia Funds tell investors in prospectuses that "the fund is not intended for short-term or frequent trading in its shares." However, during much of the period when the timing arrangements are said to have been in place, Columbia had much stricter language. For example, the November 2002 prospectus language on many Columbia funds said that "the fund does not permit short-term or excessive trading in its

shares." Mr. Salmans, the Fleet spokesman, said the change was made in conjunction with the redemption fees and other measures that were believed to be a stronger deterrent to timers than prospectus language.

Meanwhile, according to an administrative complaint filed by the Massachusetts Securities Division, brokers at the former Prudential Securities' Boston office testified that a mutual fund sales representative-identified by people familiar with the matter as working far Liberty, which was later renamed Columbia-helped them circumvent Liberty's anti-market-timing rules. The brokers testified that the sales rep "knew we were actively trading their funds and was promoting it," according to the complaint [Emphasis added.]

<strong>The Prospectuses Were Materially False and Misleading</strong>

40. Prior to investing in any of the Columbia Funds, including the Columbia Young Investor Fund, Plaintiffs and each member of the class were entitled to and did receive one of the Prospectuses, each of which contained substantially the same materially false and misleading statements regarding the Columbia Funds' policies on timed trading.

41. The Prospectuses falsely stated that the Columbia Funds actively safeguard shareholders from the recognized harmful effects of timing. For example, in language that typically appeared in the Prospectuses, the August 30, 2002 Columbia International Stock Fund Prospectus acknowledged that "short-term trading" is harmful to shareholders and represented that the Columbia Funds deters the practice, stating as follows:

> **The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses**. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request, particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The fund into which you would like to exchange also may reject your request. [Emphasis added]

42. The Prospectuses failed to disclose and misrepresented the following material and adverse facts:

    (a)    that Defendants had entered into an agreement allowing the Defendants to

18

time their trading of the Columbia Funds shares;

(b)    that, pursuant to that agreement, the Defendants regularly timed their trading in the Columbia Funds shares;

(c)    that, contrary to the express representations in the Prospectuses, the Columbia Funds enforced their policy against frequent traders selectively, i.e., they did not enforce it against the Defendants;

(d)    that the Fund Defendants regularly allowed market timers to engage in trades that were disruptive to the efficient management of the Columbia Funds and/or increased the Columbia Funds' costs and thereby reduced the Columbia Funds' actual performance; and

(e)    the Prospectuses failed to disclose that, pursuant to the unlawful agreements, the Fund Defendants benefited financially at the expense of the Columbia Funds investors.

### Defendants' Scheme and Fraudulent Course of Business

43.    Each defendant is liable for (i) making false statements, or for failing to disclose adverse facts while selling shares of the Columbia Funds, and/or (ii) participating in a scheme to defraud and/or a course of business that operated as a fraud or deceit on purchasers of the Columbia Funds shares during the Class Period (the "Wrongful Conduct"). This Wrongful Conduct enabled Defendants to profit at the expense of Plaintiffs and other Class members.

### Additional Scienter Allegations

44.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Columbia Funds were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

19